[Crim. No. 6764.   In Bank.   Jan. 27, 1961.]

THE PEOPLE, Respondent, v. ALEXANDER ARAGON ROJAS et al., Appellants.

Alexander L. Oster and A. Brigham Rose for Appellants.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

SCHAUER, J.—In a trial by the court, after proper waiver of jury, defendants Rojas and Hidalgo were found guilty of a charge of receiving stolen property. Defendants' motions for new trial were denied. Rojas was granted probation without imposition of sentence and Hidalgo was sentenced to state prison. They appeal, respectively, from the order granting probation, the judgment, and the orders denying the motions for new trial.

Defendants urge that they were guilty of no crime (or, at most, of an attempt to receive stolen property) because when they received the property it had been recovered by the police and was no longer in a stolen condition. The attorney general argues that because the thief stole the property pursuant to prearrangement with defendants he took it as their agent, and the crime of receiving stolen property was complete when the thief began its asportation toward defendants and before the police intercepted him and recovered the property.[1] We have concluded that defendants are guilty of attempting to receive stolen goods; that other matters of which they complain do not require a new trial; and that the appeal should be disposed of by modifying the finding that defendants are guilty as charged to a determination that they are guilty of attempting to receive stolen property, and by reversing with directions to the trial court to enter such judgments or probation orders as it deems appropriate based upon the modified finding.

During the night of March 3, 1959, electrical conduit worth about $4,500 was stolen from John Taft in Ventura. On the day of March 4 Officer Lovold of the Los Angeles Police Department, who was investigating the Ventura offense, saw William Hall sitting in an automobile on a Los Angeles street

---

[1]Whether under the established circumstances the defendants might be guilty of theft (under Pen. Code, § 31) is not discussed because the defendants were not charged with that crime either specifically or as an included offense. (See *People* v. *Lima* (1944), 25 Cal.2d 573, 576-577 [1, 2] [154 P.2d 698]; see also *infra*, pp. 259 and 260, and Pen. Code, §§ 664, 665 and 1159.)

opposite a truck which contained Taft's conduit. Hall was arrested and he and the truck were taken to a police station. Hall said that "he had an understanding with Mr. Hidalgo [one of the defendants] that he would buy any and all electrical appliances or electrical materials that he could get and that he had several transactions with him in the past."

On the afternoon of March 4 Hall made three telephone calls from the police station to Hidalgo's place of business. Officer Lovold listened to these conversations on a telephone in another office. The person who answered the first call, at about 4:20 p. m., asked Hall to call back. Hall did so at about 4:35 and, according to Lovold's testimony, had the following conversation with a person who identified himself as "Joe" (which is Hidalgo's first name): "Hall: "This is Bill. How about . . . the conduit? Are you ready for it?" Joe: "No, I don't have the money yet. Can you call me back around 7:00 o'clock? . . . I have to get some money . . . ."

Lovold further testified that at 7 p. m. Hall telephoned again, "had Hidalgo over the phone," and the following conversation took place: Hall: "Hello, Joe . . . . This is Bill, . . . how about the material?" Joe: "Yes, you can bring it over. I don't have all the money now but I can give you a part of it now and the rest tomorrow. . . . Bring the material but don't bring the truck to my place of business. Park it a couple of blocks away. . . . Come alone. Be here at 8:00 o'clock."

On the night of March 4, Hall, accompanied by Police Officer Saville in plain clothes, drove the truck of conduit to about two blocks from Hidalgo's electrical shop. They walked to the shop. Hall introduced Officer Saville to Hidalgo as "Rudy" (the name of Hall's cousin). Hidalgo said that he did not want the truck brought to his shop because "his place was 'hot' and was being watched by the police." At Hidalgo's request Hall and Saville returned to the truck and drove it, following Hidalgo in his car, to Mott Street, where they parked. There Hidalgo left for about 30 minutes, returned and told Hall and Saville to leave the keys in the truck, and drove them to still another location in Hidalgo's car. Hidalgo referred to the "last time I got stuff from you guys," and said that "I know you guys will let me make money"; that he would pay $700 for the present load; that "in the future he would prefer . . . doing business with Hall alone. Who Hall split with was his business but for his protection, Hall's protection, to come alone." Hidalgo

paid Hall $200 and "instructed Hall to call him the following day at noon and he would tell him where to get the truck and . . . the balance of the money which was $500.00."

Officers Lovold and Bischonden, meanwhile, had followed the truck from the police station. On Mott Street, after Hall and Hidalgo left the truck, defendant Rojas arrived and drove it to a lot by Rojas' place of business (a shop and warehouse). The officers "staked out" the truck and later on the night of March 4 saw the two defendants examine its contents and then leave.

At 8 o'clock the following morning Rojas opened his shop and began to unload the conduit from the truck. Rojas was then placed under arrest.

Lieutenant Lauritzen, one of the arresting officers, said, "You know that this property was stolen." Rojas replied, "I know that it was stolen but I'm not making any money out of it myself. . . . I'm not kidding and it's no use trying to kid you. You know it's stolen and I know it's stolen."

The offense with which defendants were charged and of which they were convicted was receiving "property which has been *stolen . . . , knowing the same to be so stolen.*" (Pen. Code, § 496, subd. 1; italics added.) Defendants, relying particularly upon *People* v. *Jaffe* (1906), 185 N.Y. 497, 501 [78 N.E. 169, 7 Ann.Cas. 348, 9 L.R.A. N.S. 263, 266], urge that they neither received stolen goods nor criminally attempted to do so because the conduit, when defendants received it, was not in a stolen condition but had been recovered by the police. In the Jaffe case the stolen property was recovered by the owner while it was en route to the would-be receiver and, by arrangement with the police, was delivered to such receiver as a decoy, not as property in a stolen condition. The New York Court of Appeals held that there was no attempt to receive stolen goods "because neither [defendant] nor anyone else in the world could know that the property was stolen property inasmuch as it was not in fact stolen property. . . . If all which an accused person intends to do would if done constitute no crime it cannot be a crime to attempt to do with the same purpose a part of the thing intended."

Defendants also cited *People* v. *Zimmerman* (1909), 11 Cal. App. 115, 118 [104 P. 590], which contains the following dictum concerning a state of facts like that in the Jaffe case: "The circumstances of the transaction . . . did not constitute an offense, as the goods were taken to the defendant's house with the consent and at the request of the owner."

As pointed out by the District Court of Appeal in *Faustina* v. *Superior Court* (1959), 174 Cal.App.2d 830, 833 [1] [345 P.2d 543], "The rule of the Jaffe case has been the subject of much criticism and discussion." (See Smith, *Two Problems in Criminal Attempts* (1957), 70 Harv.L.Rev. 422, 439; Sayre, *Criminal Attempts* (1928), 41 Harv.L.Rev. 821, 853; Keedy, *Criminal Attempts at Common Law* (1954), 102 Pa. L.Rev. 464, 476; Strahorn, *The Effect of Impossibility on Criminal Attempts* (1930), 78 Pa.L.Rev. 962, 990; Arnold, *Criminal Attempts* (1930), 40 Yale L.J. 53, 77; A.L.I. Model Penal Code, Tent. Draft No. 10 (1960), p. 30.)  ▆ In our opinion the following criticism (Hall, General Principles of Criminal Law (1947), p. 127) is sound: "The confusion between what the defendant actually did and his intent is apparent. Intent is in the mind; it is not the external realities to which intention refers. The fact that defendant was mistaken regarding the external realities did not alter his intention, but simply made it impossible to effectuate it."

The situation here is materially like those considered in *People* v. *Camodeca* (1959), 52 Cal.2d 142, 146-147 [6-9] [338 P.2d 903] (attempted theft by false pretenses); and *People* v. *Lavine* (1931), 115 Cal.App. 289, 300-301 [11] [1 P.2d 496] (attempted extortion). Each of those cases is decided on the hypothesis that the defendants had the specific intent to commit the substantive offense and that under the circumstances as the defendants reasonably saw them they did the acts necessary to consummate the substantive offense; but because of circumstances unknown to defendants, essential elements of the substantive crime were lacking.  ▆ Here, the goods did not have the status of stolen property and therefore defendants, although *believing* them to be stolen, could not have had *actual knowledge* of that condition. In *People* v. *Werner* (1940), 16 Cal.2d 216, 225 [105 P.2d 927], overruled by Camodeca, the "victim" was not deceived by defendants' false representations and therefore there was no lack of consent to the taking of the property. In the Lavine case, *supra,* the pretending victim was not induced by *fear* to part with any money; rather, the "victim" told the district attorney of the asserted or proposed attempt and by prior arrangement between the district attorney and the "victim" the "extorted" money was paid to defendants who were immediately thereafter arrested by officers who were awaiting the event. It is held (p. 300 [11] of 115 Cal.App.) that "in attempted extortion the crime depends upon the acts, mind

and intent of the person threatening and not upon the effect or result upon the person to be coerced."

██ In the case at bench the criminality of the attempt is not destroyed by the fact that the goods, having been recovered by the commendably alert and efficient action of the Los Angeles police, had, unknown to defendants, lost their "stolen" status, any more than the criminality of the attempt in the case of *In re Magidson* (1917), 32 Cal.App. 566, 568 [163 P. 689], was destroyed by impossibility caused by the fact that the police had recovered the goods and taken them from the place where the would-be receiver went to get them. In our opinion the consequences of intent and acts such as those of defendants here should be more serious than pleased amazement that because of the timeliness of the police the projected criminality was not merely detected but also wiped out. (*Cf. People* v. *Jelke* (1956), 1 N.Y.2d 321, 329 [152 N.Y.S.2d 479, 135 N.E. 213], explaining the Jaffe decision, *supra,* 185 N.Y. 497, as a case "like selling oil stock and being surprised to discover that oil was actually in the ground where the accused vendor had represented but not believed it to be" —conduct which the New York Court of Appeals apparently feels is not criminal.)

We approve the holding of the Faustina case (1959), *supra,* page 834 of 174 Cal.App.2d, that upon a state of facts such as that here, "Even though we say that, technically, the [goods] were not 'stolen' nevertheless the defendant did attempt to receive stolen property." The dictum in the Zimmerman case (1909), *supra,* p. 118 of 11 Cal.App., that such a state of facts does not constitute a crime is disapproved.

The People would have us go farther and hold that the evidence here supports the finding that defendants are guilty of the consummated offense of receiving stolen property. In this regard the People advance two theories. ██ The first is that the goods, when they came into the hands of defendants, had not lost their stolen character because Officer Saville, the "undercover man," was acting as "agent" of the city and not of the true owner. We believe that both the owner and the police would take unkindly to the suggestion that property which has been the subject of larceny and has then been recovered by law enforcement officers remains "stolen" while it is under the surveillance of the police. It seems obvious that stolen property, recaptured by the police, no longer has the status of stolen goods but, rather, is held by the police in trust for, or for the account of, the owner. (The precise

nature of the bailment is not here material.) *State* v. *Marsalise* (1931), 172 La. 796, 802-803 [5] [135 So. 361], cited by the People, concerns a feigned accomplice who cooperated with but was not a member of the police; it does not discuss, and upon its facts does not raise, the problem of stolen goods which come into actual possession of their owner or the police and are then sent on their way to the intended receiver as a decoy.

The People's second theory that the evidence supports the finding that the crime of receiving stolen property was consummated proceeds as follows: The thief, Hall, stole pursuant to a prearranged ''understanding with Mr. Hidalgo that he [defendant Hidalgo] would buy any and all electrical appliances or electrical materials that he [Hall] could get.'' Therefore, they were accomplices; both Hall and defendants, as members of the conspiracy, were liable to prosecution as principals either in the crime of theft or in the crime of receiving stolen property. (*People* v. *Lima* (1944), *supra,* 25 Cal.2d 573, 578-579 [3, 4]; *People* v. *Raven* (1955), 44 Cal.2d 523, 526 [5] [282 P.2d 866].) Upon this view of the situation, the People say, the crime of receiving stolen goods was completed by Hall, as ''agent'' for defendants, when he put the goods in his truck in Ventura and started driving to Los Angeles.

The People's attempt to apply rules of the law of agency to the law of crimes in this situation is inappropriate. ▮ The thief, even when he steals pursuant to a conspiracy with a prospective receiver, cannot receive the stolen goods from himself. It is true that, under the rule of the Lima case (1944), *supra,* 25 Cal.2d 573, 578-579 [3, 4], ▮ Hall might have become criminally liable as a receiver if the crime of receiving stolen goods had been completed by delivery of the goods to Hidalgo while they were still in a stolen condition, but that crime was not consummated. Hall was not a servant of Hidalgo whose possession or custody, under agency principles, was that of Hidalgo, nor was there some moment during Hall's asportation of the stolen property when he ceased to act as a thief and became, in contemplation of law, a receiver.

▮ Defendants urge that they were convicted upon the uncorroborated admissions of the accomplice Hall. (Hall was called as a witness by defendants, not by the People.) The contention is without merit. Defendants were firmly tied to the charged offense by the testimony of the police officers who heard defendants' own admissions and saw their conduct.

▮ Defendants contend that Officer Lovold's evidence of the telephone calls of Hall to defendant Hidalgo was ob-

tained in violation of the Federal Communications Act (47 U.S.C.A. § 605)[2] and section 640 of the California Penal Code[3] and therefore was inadmissible under the exclusionary rule of *People* v. *Cahan* (1955), 44 Cal.2d 434, 445 [7] [282 P.2d 905, 50 A.L.R.2d 513]. (See *Rathbun* v. *United States* (1957), 355 U.S. 107, 110 [78 S.Ct. 161, 2 L.Ed.2d 134]; *People* v. *Dement* (1957), 48 Cal.2d 600, 605 [5, 6] [311 P.2d 505]; *People* v. *Malotte* (1956), 46 Cal.2d 59, 63-64 [1-3] [292 P.2d 517]; *People* v. *Graff* (1956), 144 Cal.App.2d 199, 205 [1] [300 P.2d 837].) There is no evidence as to whether Hall did or did not know of or consent to Lovold's listening to the conversations, and defendants at the trial did not object to the admission of the evidence on the ground of their present contention. Therefore, the merits of the contention were not before the trial court and are not before this court. (See *Coy* v. *Superior Court* (1959), 51 Cal.2d 471, 473 [2] [334 P.2d 569]; *Robison* v. *Superior Court* (1957), 49 Cal.2d 186, 187 [1] [316 P.2d 1].)

■■■ Defendants (as an alternative to their contention that there was no crime) urge that the evidence establishes the defense of entrapment. Their reliance on this defense is misplaced. The police here simply detected and observed the criminal activities of defendants without calling them to a halt until they had come near to apparent completion. There is no suggestion in the evidence that the officers were carrying out "illegal or unjust schemes designed to foster rather than prevent and detect crime." (*People* v. *Benford* (1959), 53 Cal.2d 1, 9 [345 P.2d 928].)

■■■ Section 1159 of the Penal Code provides that a defendant may be found guilty of an attempt to commit the offense with which he is charged.[4] Section 1181 (subd. 6) provides, "When the . . . finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a . . . lesser crime included therein, the court [the

---

[2] "[N]o person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, . . . or meaning of such intercepted communication to any person."

[3] "Every person who . . . wilfully and fraudulently, or clandestinely . . . makes any unauthorized connection with any . . . telephone wire . . . or instrument under the control of any . . . telephone company; or who wilfully and fraudulently, or clandestinely, or in any other unauthorized manner, . . . learn[s] the contents or meaning of any message . . . while the same is . . . passing over any . . . telephone wire . . . is punishable . . . ."

[4] See footnote 1, *ante*, p. 254.

appellate court as well as the trial court] may modify the . . . finding or judgment accordingly . . . ." (See also Pen. Code, § 1260; *People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 414 [5] [303 P.2d 1018]; *People* v. *Jackson* (1955), 44 Cal.2d 511, 521 [282 P.2d 898].)

The orders denying defendants' motions for new trial are affirmed. The trial court's finding that defendants are guilty as charged is modified to find them guilty of the offense of attempting to receive stolen property. The judgment and probation order are reversed and the cause is remanded to the trial court for further proceedings not inconsistent with the views hereinabove expressed, and with directions to enter such lawful judgment or order against each defendant, based on the modified finding, as the court deems appropriate.

Gibson, C. J., Traynor, J., McComb, J., Peters, J., White, J., and Dooling, J., concurred.

Appellants' petition for a rehearing was denied February 21, 1961.